UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA          :

           v.          :          Docket No. 3:10CR227-12(EBB)

MANOKUS FIELDS          :

RULING ON MOTION TO SUPPRESS

     The defendant, Manokus Fields ("Fields"), moves to suppress the statements he made to a DEA Special Agent during his post-arrest custodial interrogation on the grounds that he did not knowingly and voluntarily waive his Fifth Amendment right to remain silent.  He asserts that the arresting officers questioned him without properly advising him of his Miranda rights, did not ask him specifically if he wanted to waive them and did not obtain his written waiver before questioning him.[1]  The government asserts that there is no factual or legal support for his motion. The Court agrees and, for the following reasons, DENIES his motion [doc. #679].

**_Background_**

     On November 10, 2010, a grand jury returned a multi-count indictment charging Fields and thirty-six other individuals with various narcotics trafficking and firearms offenses.  Fields was charged in one count with conspiracy to possess with intent to distribute and to distribute 28 grams or more of cocaine base, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B) and 846. Fields was arrested and presented before a United States Magistrate Judge on November 17, 2010 and was detained without bond.  The indictment was the result of a DEA Joint Drug Task

---

    [1]Initially, Fields asserted that the arresting officers did not advise him of his Miranda rights or, alternatively, questioned him after he invoked his right to remain silent.  However, in his post-hearing memorandum in support of his motion to suppress, Fields concedes that he was orally read his rights from a standard DEA advice of rights form.

Force's extensive, large-scale investigation of a street level drug gang headed by Joseph Jackson, a/k/a "Mighty," which operated primarily in the Newhallville section of New Haven, Connecticut.  The investigation involved court-ordered wiretaps of numerous cellular telephones, including one used by Fields, audio and video surveillance by members of the Task Force and controlled purchases.

The Court held a hearing on Field's motion to suppress on July 25, 2012.

### *Factual Findings*

At the suppression hearing, the government called the two law enforcement officers who were involved in questioning Fields at the time he was arrested: DEA Special Agent Anastas Ndrenika ("SA Ndrenika") and DEA Task Force Officer David Rivera ("Officer Rivera"). Fields presented no evidence in support of his motion.  He did not testify, nor did he submit a sworn affidavit or affirmation.  He called no witnesses.  Based on the credible testimony of the law enforcement officers, the exhibits presented by the government, as well as the uncontested facts, the Court finds the following facts to be established.

An arrest warrant for Fields was issued on November 11, 2010.  Most of Fields's co-defendants were arrested during a sweep on November 16, 2010, but despite the efforts of the Task Force officers and agents to locate him at his third-floor residence at 341 Peck Street in New Haven, Connecticut, Fields remained at large.  On November 17, 2010, SA Ndrenika, one of the two DEA case agents, and U.S. Marshall Woods ("Marshall Woods") were driving in Marshall Woods's vehicle on Ferry Street near the intersection of Peck Street in the Fair Haven section of New Haven in an attempt to find Fields.  In a separate car, two other law enforcement officers, Officer Rivera and DEA Task Force Officer Dedric Jones ("Officer Jones"), were

driving in the same general area also looking for Fields.

At approximately 8:45 a.m., the vehicle driven by Officer Rivera slowly drove past an SUV that was stopped in the traffic lane, about five feet from the curb opposite 296 Peck Street near the intersection of Ferry Street.  Officer Rivera observed a man standing outside the SUV next to the driver's window conversing with the driver.  As he drove past, he recognized Fields as the man standing next to the SUV.  Officer Rivera immediately backed up and stopped his car next to the SUV.  He and Officer Jones exited their vehicle and approached Fields.  Officer Rivera placed Fields under arrest without resistance or incident

At that time, SA Ndrenika and Marshall Woods were driving on Ferry Street near the intersection of Peck Street when they saw Officers Rivera and Jones stop and exit their vehicle and approach the man standing next to the SUV.  They immediately drove to the scene.  When SA Ndrenika exited the vehicle, he observed Officer Rivera handcuff Fields.  As SA Ndrenika approached, Officer Rivera placed Fields under arrest, walked him, with his hands cuffed behind his back, to Officer Rivera's car and placed him in the back passenger-side seat sitting sideways facing the street.  The passenger-side door was open and Fields's feet were on the pavement.  SA Ndrenika approached Fields and informed him of the arrest warrant that had been issued for him and the charges against him.  SA Ndrenika then took his yellow, DEA-issued "Advice of Rights Card"[2] out of his wallet.  As he was doing so, he instructed Officer Rivera to get a pad to take notes.  Officer Rivera walked to the rear of the car, opened the hatchback and returned with a pad.  At approximately 8:55 a.m., SA Ndrenika calmly and in a normal voice read Fields the

---

[2]The advice of rights form was a printed 4" x 2.5" yellow card that was marked "DEA - 13A (6/84)."

3

contents of the printed card, pausing after each statement to make sure Fields understood.

Officer Rivera witnessed SA Ndrenika read Fields his rights and ask him questions.

     The advice of rights form that SA Ndrenika read, word-by-word, to Fields contained the

following language:

ORAL WARNINGS TO BE GIVEN
TO A SUBJECT PRIOR TO
INTERROGATION

Before we ask you any questions, you
must understand:

-You have the right to remain silent.

-Anything you say can be used
 against you in court.

-You have the right to talk to a
 lawyer for advice before we ask
 you any questions and to have a
 lawyer with you during questioning.

-If you cannot afford a lawyer, one
 will be appointed for you before
 any questioning if you wish.

Do you understand?

Are you willing to answer some
questions?

     In response to the question:"Do you understand," Fields said "Yes."  In response to the

question: "Are you willing to answer some questions?" Fields also replied "Yes."

     Both SA Ndrenika and Officer Rivera testified that they knew from listening to Fields's

wiretapped phone calls that he spoke and understood English.  They also noted that Fields was

lucid, appeared to understand what SA Ndrenika read to him, showed no signs of being

4

intoxicated or on drugs, appeared to be in his right mind, and that, during the entire time SA Ndrenika questioned Fields, he displayed no behavior that would cause them to question his competence, never hesitated or stopped talking, never asked a question and never asked for an attorney.

Immediately after Fields indicated that he understood his <u>Miranda</u> rights and was willing to cooperate, SA Ndrenika began asking Fields questions and Fields answered them in a conversational manner.  Officer Rivera stood by and took notes of what Fields said.  Fields stated that between June 2010 and October 2010, he distributed crack cocaine in the area of Ferry Street and Peck Street in New Haven.  He purchased eight-ball quantities of crack cocaine on a daily basis, usually one or two eight balls at a time, directly from Joseph Jackson, a/k/a/ "Mighty" and two other men who worked under Jackson – one was an unnamed Puerto Rican male, the other was a man he knew as "Pooka."  Jackson and the other two men would deliver the eight balls of crack cocaine to Fields in the area of 222 Dover Street in New Haven.  Fields said he would either resell an entire eight ball and would make a profit of between $10.00 to $20.00 or break up an eight ball and repackage it into twenty-seven individual baggies, which he would sell for $10.00 each.

The questioning of Fields lasted ten minutes at the most.  When the questioning ended, Marshal Woods put Fields in his vehicle, SA Ndrenika got in the back seat next to Fields and Woods drove directly to the U.S. Marshal's office on Church Street in New Haven where Fields was processed and held pending his initial presentment before a United States Magistrate Judge later that day.  Fields was not asked any additional questions and did not provide any additional information during the drive to Church Street.

Both SA Ndrenika and Officer Rivera have extensive experience in investigating and handling drug cases and making arrests.  Both officers are well versed in the proper procedures to be used when making an arrest and before asking questions of a suspect in a custodial setting. They both carry with them at all times the standard DEA-13A(6/84) form and always read from it when they advise a suspect of his Miranda rights.  Neither of the officers routinely carry on their person or in their vehicles a written advice of rights/waiver form because they are not required to do so.   They testified that they are not required to obtain a written waiver in cases where a suspect is orally read his rights and voluntarily waives them and there is someone present to act as a witness.  Neither Officer Rivera nor SA Ndrenika used any coercive tactics or made any threats in connection with the arrest and questioning of Fields.  They did not have their weapons drawn. The questioning itself was very brief and the entire arrest took no more than ten minutes. Fields had been arrested previously on two separate occasions and was familiar with the criminal justice system.

### *Legal Standard*

Statements made during a custodial interrogation must normally be suppressed if the suspect is not first advised of his Miranda right to remain silent and to the presence of an attorney prior to questioning and knowingly, intelligently and voluntarily waives those rights.  E.g., United States v. Male Juvenile, 121 F.3d 34, 39-40 (2d Cir. 1997).  Where a defendant alleges that law enforcement officers conducted a custodial interrogation without first advising him of his Fifth Amendment rights, the burden is on the government to prove by a preponderance of the evidence that the defendant was properly advised of his Miranda rights and voluntarily relinquished them.  E.g., Lego v. Twomey, 404 U.S. 477, 489 (1972); United States v. Anderson,

929 F.2d 96, 98 (2d Cir. 1991).  A voluntary relinquishment of Miranda rights occurs when it is the "product of a free and deliberate choice rather than intimidation, coercion, or deception." United States v. Male Juvenile, 121 F.3d at 41 (quoting Moran v. Burbine, 475 U.S. 412, 421 (1997)); see also United States v. Bye, 919 F.2d 6, 9 (2d Cir. 1990) (noting that the test is "whether the waiver . . . [was] the product of an essentially free and unconstrained choice by [its] maker.").

In assessing the voluntariness of a defendant's waiver, the court must consider the totality of the surrounding circumstances, including the defendant's mental and physical characteristics, the type and length of the interrogation and the conduct of the police officers.  United States v. Anderson, 929 F.2d at 99; see also Colorado v. Connelly, 479 U.S. 157, 169-70 (1986) (stating that a statement is voluntary when there is an absence of coercion); United States v. Okwumabua, 828 F.2d 950, 953 (2d Cir. 1987) (deeming confession voluntary where there was no evidence that the suspect was subjected to any threats, physical coercion or protracted interrogation).

According to the Supreme Court, although the Miranda requirement itself is rigid, this "rigidity" does not extend "to the precise formulation of the warnings given a criminal defendant."  California v. Prysock, 453 U.S. 355, 359 (1981) ("Miranda itself indicated that no talismanic incantation was required to satisfy its strictures.").  Thus, neither an express, written or oral statement of waiver is required to establish that it is knowing and voluntary.  United States v. Scarpa, 897 F.2d 63, 68 (2d Cir. 1990) ( finding a valid waiver where defendant answered questions during transport one day after being given his rights and without being asked whether he wanted to waive them); United States v. Boston, 508 F.2d 1171, 1175 (2d Cir. 1974) (noting  it is clear that a written waiver is not required and the absence of one does not bar the

admission of a confession).  "Where the prosecution shows that a <u>Miranda</u> warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent."  <u>United States v. Plugh</u>, 648 F.3d 118, 127 (2d Cir. 2011) (quoting <u>Berghuis v. Thompkins</u>, 130 S. Ct. 2250, 2262 (2010)); <u>see also</u> <u>North Carolina v. Butler</u>, 441 U.S. 369, 373 (1979) ("Waiver can be inferred from the actions and words of the person interrogated."); <u>United States v. Hall</u>, 724 F.2d 1055, 1059 (2d Cir. 1983) (finding a valid waiver where defendant started answering questions after being advised of rights notwithstanding officer's failure to ask him if he understood).

### ***Discussion***

In contrast to Fields's unsupported, bald assertions that his post-arrest statements must be suppressed because he was not properly advised of his <u>Miranda</u> rights and did not expressly indicate that he was voluntarily relinquishing them by executing a written <u>Miranda</u> waiver form, the government has, by uncontested, credible and sworn testimony, satisfied its burden of proving that Fields was properly <u>Mirandized</u> and knowingly and voluntarily relinquished his rights.  Further, contrary to Fields's assertions, for a waiver of rights to be valid, the law does not require a defendant to sign a written waiver form.  <u>E.g.</u>, <u>Butler</u>, 441 U.S. at 376 (rejecting the argument that a defendant's refusal to sign a written waiver precludes finding a valid waiver). Indeed, in addition to not requiring a written waiver, the law does not require either an express or oral waiver, nor does it require police officers to ask a suspect if he understands his rights and wants to waive them.  <u>United States v. Hall</u>, 724 F.2d at 1059.  Thus, the facts and the well-settled law pertaining to <u>Miranda</u>, compel the Court to find that, under the totality of the circumstances, Fields knowingly and voluntarily gave his post-arrest statements after he was

properly advised of his Fifth Amendment rights and indicated that he waived them.

The two officers involved in questioning Fields testified that SA Ndrenika orally read Fields his <u>Miranda</u> rights from the standard DEA advice of rights card, that Officer Rivera witnessed SA Ndrenika read the advice of rights form to Fields and Fields's oral acknowledgment that he understood his rights and was voluntarily waiving them. <u>See</u> <u>United States v. Martinez</u>, 634 F. Supp. 1144, 1147 (S.D.N.Y. 1986) (holding that officer's sworn testimony that <u>Miranda</u> warnings were given was sufficient to deny suppression of post-arrest statement in the absence of a properly supported statement from anyone with personal knowledge of the underlying facts). The Court has no basis to question the credibility of the officers and their uncontradicted testimony is sufficient to support a finding that Fields was properly advised of his rights, acknowledged that he understood them and relinquished them knowingly and voluntarily before he provided any information. <u>See</u> <u>United States v. Gaines</u>, 295 F.3d 293, 298 (2d Cir. 2002) (declining to suppress defendant's statements in case where defendant did not sign a waiver of rights form and officer testified that he read warnings to defendant from a form and defendant verbally acknowledged he understood his rights).

In addition, the totality of the circumstances surrounding the questioning of Fields, including the conduct of the law enforcement officers, the conditions and duration of the questioning and Fields's mental and physical condition, establish that Fields's waiver was voluntary, intelligent and knowing. Specifically, Fields spoke and understood English. He never indicated, in any way, that he did not understand what was happening or what he was doing. He had prior experiences with the criminal justice system. Indeed, in response to SA Ndrenika's question as to whether he understood his rights, Fields unequivocally answered "Yes" before he

voluntarily started to answer questions.  There is no evidence of coercion or overbearing on the part of the law enforcement officers.  The questioning was straightforward and brief – lasting at most ten minutes.  During the questioning, Fields never stopped answering questions, never said he wanted an attorney or otherwise indicated that he no longer wished to answer questions.

In sum, there is noting in the record to indicate that Fields was not properly advised of his Miranda rights and knowingly and voluntarily waived them and thus his post-arrest statements will not be suppressed.

### ***Conclusion***

For the foregoing reasons, Fields's motion to suppress [doc. # 679] is DENIED.

SO ORDERED.

/s/_____

ELLEN BREE BURNS
SENIOR UNITED STATES DISTRICT JUDGE

Dated this 11th day of September, 2012, at New Haven, Connecticut.

10